UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION, | § § § |
| Plaintiff, | § § § |
| VS. | §   CIVIL ACTION NO. H-09-4080 § |
| ROCKWELL ENERGEY OF TEXAS, LLC, ROCKWELL ENERGY MANAGEMENT, LLC, GREGORY S. SHINDLER, BRADLEY M. JAMES, W. TODD SMITH, STUART E. RAWITT, and BRIAN W. WALSH, | § § § § § § § § |
| Defendants. | § |

## MEMORANDUM AND ORDER

Pending before the Court is the Plaintiff's Motion for Final Judgment of Disgorgement, Prejudgment Interest, and Third-Tier Civil Penalties against Defendants Rockwell Energy of Texas, LLC ("RET"), Rockwell Energy Management, LLC ("REM"), Gregory S. Shindler, Bradley M. James, and Stuart E. Rawitt (collectively, the "Defendants").[1] After considering the motion, all responses thereto, the parties' supplemental briefing, and the applicable law, the Court finds that the motion must be GRANTED IN PART and DENIED IN PART.

**I.   BACKGROUND**

Plaintiff, the Securities and Exchange Commission (the "SEC" or the "Commission"), brought this case alleging unregistered fraudulent securities offerings

---

[1] In July 2011, the Court issued a default judgment against Defendants W. Todd Smith and Brian W. Walsh. (Doc. No. 51.)

1

against a number of defendants. For the purposes of this Memorandum and Order, the SEC's Complaint alleges that James, Shindler, REM, and RET defrauded investors in two oil-and-gas investment funds, Rockwell Energy Production and Acquisition Fund, LP ("Fund I"), and Rockwell Energy Acquisition Fund, LP ("Fund II"). RET is the general partner of Fund I, and REM is the general partner of Fund II. RET and REM are currently under the control of Kelly Crawford, the Court-appointed Special Master in charge of liquidating the assets of Funds I and II and making claims distributions. (*See* Order Appointing Special Master, Doc. No. 45.) Prior to Crawford's appointment, Shindler owned and controlled RET (Fund I) and REM (Fund II). James co-owned and managed REM (Fund II) with Shindler until December 1, 2008, when James purportedly resigned from REM. Defendant Rawitt offered and sold partnership interests in Fund II to investors.

Fund I and Fund II raised approximately $5.5 million from 139 investors between March 2008 and February 2009. (Pl. Compl. ¶ 1, Doc. No. 1.) Both Fund I and Fund II purported to invest in gas wells and outfit them with "green" technology that allegedly enhanced production. (*Id.* ¶¶ 18, 37-38) In reality, Fund I made minimal investments in gas wells and little use of the alleged production-enhancing technology. (*Id.* ¶¶ 2, 23-24) Fund II never invested in gas wells. (*Id.* ¶ 40). The Funds promised investors 18% annual returns, but never generated sufficient revenue to support such returns. (*Id.* ¶¶ 3, 25-26, 39). Despite this shortfall, Shindler, RET, REM, and, for a time, James, made distributions to investors at the targeted rate for a number of months. (*Id.*) To do so, they relied in part on "investment" income other than production revenue, including payments from sham transactions designed specifically to simulate the promised returns. (*Id.* ¶¶ 25-

2

32, 40-45). Of the approximately $5.5 million raised from investors, RET and REM salespeople pocketed roughly $2.3 million in commissions or other sales-related fees. (*Id.* ¶ 49.) The SEC alleges that Rawitt made roughly $275,000 in sales-related fees through direct solicitations to potential investors. (*Id.* ¶ 15, 51). Rawitt was not licensed to sell securities, nor was he associated with a registered broker or dealer. (*Id.* ¶¶ 15, 48.)

The Defendants consented to the entry of judgment permanently restraining and enjoining them from violating the securities laws under which the SEC sued them in this action. By signing consents, each of the Defendants agreed that, upon the SEC's motion, the Court would consider the remaining relief sought in Plaintiff's petition, including disgorgement of ill-gotten gains, prejudgment interest, and civil penalties.

On July 15, 2010, the Court entered an "Agreed Judgment of Permanent Injunction," permanently enjoining Defendant Rawitt from committing further violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77e(a) and 77e(c)), and Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78o(a)(1)). (Doc. No. 27.) On March 23, 2011, the Court entered an "Agreed Judgment of Permanent Injunction," permanently enjoining RET, REM, Shindler, and James from committing further violations of Section 10(b) of the Exchange Act, (15 U.S.C. § 78j(b)); Rule 10b-5 of the Exchange Act (17 C.F.R. § 240.10b-5); and Sections 17(a), 5(a), and 5(c) of the Securities Act (15 U.S.C. §§ 77q(a), 77e(a) and 77e(c)). (Doc. No. 41.) Under the agreed judgments, Defendants waived findings of fact, conclusions of law, and any right to appeal the judgment. In addition, Defendants are precluded from arguing that they did not violate the federal securities

laws as alleged in the Complaint, and the allegations of the Complaint are to be accepted as and deemed true by the Court.

The SEC has filed a Motion for Judgment seeking disgorgement from all Defendants, prejudgment interest from Defendants James and Shindler, and third-tier penalties from Defendants James and Shindler. Defendants have filed responses disputing the disgorgement amounts requested by the SEC and challenging the propriety of prejudgment interest and civil penalties. The Special Master has submitted his final "Claims Report," in which he provides his recommendation as to the total claim amount that should be recognized by the Court for each investor in Fund I and Fund II. As set forth in the SEC's Notice of Updated Disgorgement Figrues, the Special Master recommends approval of claims totaling $5,098,135 ($3,245,886 in Fund I + $1,852,249 in Fund II), held by a total of 150 investors. (Supp. Decl. of Kelly M. Crawford, Doc. No. 78-1.)

## II. LEGAL STANDARD

### A. Disgorgement

A court may "exercise its equitable powers to order a defendant to 'disgorge the profits that he obtained by fraud.'" *Sec. & Exch. Comm'n v. Snyder*, 2006 WL 6508273, at *9 (S.D. Tex. Aug. 22, 2006) (citing *Sec. & Exch. Comm'n v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)). Disgorgement is an equitable remedy meant "to deprive the wrongdoer of his ill-gotten gains and deter future violations of the law." *Sec. & Exch. Comm'n v. Seghers*, 298 F. App'x 319, 336 (5th Cir. 2008) (citing *Sec. & Exch. Comm'n v. AMX*, 7 F.3d 71, 76 n. 8 (5th Cir. 1993)). District courts possess the equitable power to determine whether or not to order disgorgement. *Sec. & Exch. Comm'n v. Huffman*, 996

4

F.2d 800, 803 (5th Cir. 1993) (citing *Commodities Futures Trading Comm'n v. Am. Metals Exch. Corp.*, 991 F.2d 71, 76 (3rd Cir. 1993)). A court's "power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *Seghers*, 298 F. App'x at 336 (citing *Blatt,* 583 F.2d at 1335).

"Before a court can order disgorgement, the SEC must provide a reasonable approximation of profits or losses avoided and show that the defendant's violations proximately caused these profits or avoided losses." *Snyder*, 2006 WL 6508273, at *9. Indeed, "the SEC bears the initial burden of showing that its requested disgorgement amount reasonably approximates the amount of profits connected to the violation, and then the burden shifts to the defendant to show that this figure is not a reasonable approximation." *Sec. & Exch. Comm'n v. ConnectAJet.com, Inc.*, 2011 WL 5509896, at *7 (N.D. Tex. Nov. 9, 2011). "In the context of an offering of securities in violation of the securities laws, the proper starting point for a disgorgement award is the total proceeds received from the sale of the securities." *Sec. & Exch. Comm'n v. AmeriFirst Funding, Inc.*, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008). Defendants then must receive a set-off "for amounts repaid to investors or collected by the special master." *Sec. & Exch. Comm. v. United Energy Partners, Inc.*, 88 F. App'x 744, 747 (5th Cir. 2004).

If the SEC "shows a causal relationship between the defendant's wrongdoing and the amount by which he was unjustly enriched, that amount of money may be disgorged even if the defendant has otherwise disposed of, reinvested, or spent the particular assets that he wrongfully obtained." *Seghers*, 298 F. App'x at 336 (citing *Sec. & Exch. Comm'n v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000)). In other words, "[a] defendant

is not immune from disgorgement merely because he has spent or lost the proceeds of his fraudulent scheme." *Id.* (citing *Banner Fund Int'l*, 211 F.3d at 617).

The Fifth Circuit has expressed seemingly divergent opinions as to whether a defendant's inability to pay may be taken into account when calculating disgorgement. *Compare Huffman*, 996 F.2d at 803 (explaining that the defendant has the burden to prove inability to pay by a preponderance of the evidence), and *United Energy Partners*, 88 F. App'x at 746 (citing *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("inability to pay is irrelevant" to disgorgement liability because "[d]isgorgement deprives wrongdoers of ill-gotten gains; and a person remains unjustly enriched by what was illegally received, whether he retains the proceeds of his wrongdoing")). The Court construes these cases to mean that, while it is within a court's discretion to consider inability to pay, such a finding is irrelevant to disgorgement liability. As the Court has noted in the past, "a defendant should not be permitted to avoid disgorgement by claiming a lack of funds." *Snyder*, 2006 WL 6508273, at *9 (citing *Sec. & Exch. Comm'n v. Thorn*, 2002 WL 31412439, at *3 (S.D. Ohio 2002) ("Financial hardship does not preclude the imposition of an order of disgorgement.")). The Fifth Circuit has recognized, moreover, that "the overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses." *United Energy Partners*, 88 F. App'x at 746-47 (5th Cir. 2004) (quoting *Sec. & Exch. Comm'n v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 16 (D.D.C. 1998)).

### B. Prejudgment Interest

District courts have discretion to award prejudgment interest on a disgorgement amount. *United Energy Partners*, 88 F. App'x at 747. While the Fifth Circuit has not

detailed the factors to be considered in determining whether to award prejudgment interest, the Second Circuit has considered "(i) the need to fully compensate the wronged party for actual damages suffered; (ii) considerations of fairness and relative equities of the award; (iii) the remedial purpose of the statute involved; and/or (iv) such other general principles as are deemed relevant by the court. *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996). An award of prejudgment interest "prevents parties from benefitting from what is in essence an interest-free loan resulting from illegal activity." *ConnectAJet.com*, 2011 WL 5509896, at *8.

### C. Third-Tier Penalties

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Commission to seek, and courts to impose, civil penalties. Third-tier penalties may be imposed if the defendant's violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," 15 U.S.C. § 77t(d)(2)(C)(I), and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," 15 U.S.C. §77t(d)(2)(C)(II).

"Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *AmeriFirst Funding*, 2008 WL 1959843, at *7 (citing *Sec. & Exch. Comm'n v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007)). In determining whether civil penalties are appropriate, courts have looked to "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5)

whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *AmeriFirst Funding*, 2008 WL 1959843, at *7 (citing *Opulentica*, 497 F. Supp. 2d at 331).

### III. ANALYSIS

#### A. Disgorgement

##### 1. Baseline disgorgement liability

Because RET and Shindler managed Fund I, their baseline disgorgement liability is the amount of money raised from investors in Fund I. Because Shindler, REM, and, for a time, James managed Fund II, their baseline disgorgement liability is the amount of money raised from investors in Fund II. (In James' case, he is liable only for the amount raised by Fund II up to the point at which he resigned from REM.) Joint and several liability is appropriate as between RET and Shindler for the amounts raised by Fund I, and as between Shindler, REM, and James for the amounts raised by Fund II. *United Energy Partners*, 88 F. App'x at 747 ("joint and several liability is appropriate in securities cases where…individuals collaborate or have close relationships in engaging in illegal conduct.").

In calculating its disgorgement request, the SEC relied upon the Special Master's calculation of the total amount of losses less the amount recovered by the Special Master. Using this calculation, the Special Master determined that the total amount raised by Fund I and Fund II, less amounts paid back to investors by the funds, and less amounts that the Special Master has recovered on behalf of investors in the funds, are $3,245,886 and $1,852,249 respectively. (Doc. No. 78, Ex. 1 at 000002.) The SEC seeks the following amounts in disgorgement liability: (1) $3,245,886 from RET and Shindler; (2)

$1,852,249 from REM and Shindler; (3) $880,780 from James; and (4) $275,000 from Rawitt.

### 2. Offsetting disgorgement liability

#### a. James & Shindler

James and Shindler argue that they are entitled to offset their baseline disgorgement liability not only by the amount of money returned to investors, taken into account in the Special Master's calculation, but also by the amount spent on valid business expenses. They also argue that their liability should be reduced based upon their inability to pay.

As noted above, the Fifth Circuit has recognized that "the overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses." *See United Energy Partners, Inc.*, 88 Fed. App'x at 746-747 (quoting *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 16 (D.D.C. 1998)), *cert. denied Quinn v. SEC*, 543 U.S. 1034. That the weight of authority favors this approach is unsurprising, as the approach is in line with the purposes of disgorgement. That is, even if funds were expended for legitimate business expenses, the funds were still obtained fraudulently; disgorgement contemplates the money defendants obtained, not how they spent it.

James and Shindler also argue that their liability should be reduced based upon inability to pay. However, as discussed above, the Court finds that inability to pay is irrelevant in light of the purposes of disgorgement. *United Energy Partners*, 88 F. App'x at 746 ("inability to pay is irrelevant" to disgorgement liability because "[d]isgorgement deprives wrongdoers of ill-gotten gains; and a person remains unjustly enriched by what

was illegally received, whether he retains the proceeds of his wrongdoing); *see also Seghers*, 298 F. App'x at 336.

Neither James' and Shindler's legitimate business expenses nor their inability to pay persuades the Court to decline to award disgorgement, or to adjust downward the figure developed by the Special Master. Thus, the Court finds that RET and Shindler are jointly and severally liable for $3,245,886, the amount fraudulently raised for Fund I. REM and Shindler are jointly and severally liable for $1,852,249, the amount fraudulently raised for Fund II. Finally, James is jointly and severally liable for $880,780, the proportionate amount of his responsibility for Fund II.

### b. Rawitt

Disgorgement is appropriate not only in cases of fraud—as against RET, REM, Shindler, and James—but also where a defendant violates the securities registration provisions of the federal securities laws. *See, e.g.*, *In re Skyway Comm. Holding Corp.*, 2011 1380068, at *2 (Bankr. M.D. Fla. Apr. 6, 2011) (awarding disgorgement against an unregistered broker for violations for the registration provisions of federal securities laws); *Sec. & Exch. Comm'n v. Martino*, 255 F. Supp. 2d 268, (S.D.N.Y. 2003) (same). Rawitt does not dispute the propriety of disgorgement; rather, he focuses on a request for a downward departure from the amount requested by the SEC.

Rawitt contends that, although the SEC requested his financial information and indicated that it would take the information into account, the SEC has not given meaningful consideration to his financial condition. Evidence before the Court indicates that communication difficulties between the SEC and Mr. Rawitt led to a late submission of the pertinent information. That the SEC did not consider Rawitt's financial condition

to the extent he might have hoped is not an issue on which this Court expresses an opinion. Rather, the Court's role is to determine whether disgorgement is appropriate as against Rawitt, and, if so, in what amount.

The Court is unpersuaded by Rawitt's assertion that his acts do not "rise to the same level of inappropriateness as do those of the promoters of the investments who made false statements to me and to others." (Doc. No. 56 ¶ 10.) Rawitt provides no authorities to support his argument that less "inappropriate" conduct should warrant a reduction in disgorgement. As Rawitt's disgorgement liability is calculated based on Rawitt's own acts, and not the total amount obtained from Funds I and II, a reduction based on his comparative blameworthiness would be not only incorrect, but illogical. Thus, that he may be less guilty than James and Shindler does not persuade the Court to reduce Rawitt's disgorgement liability.

In determining the correct amount of disgorgement, the Court first must find the proper starting point. The SEC asserts that it is $275,000—an amount that Rawitt admits he was supposed to earn from his work with Fund II. Rawitt contends that, while he was supposed to earn $275,000, he actually earned around $252,200. Unfortunately, Rawitt offers no support for this argument. The Fifth Circuit has held that, "[i]n actions brought by the SEC involving a securities violation, 'disgorgement need only be a reasonable approximation of profits casually connected to the violation.'" *Allstate Ins. Co. v. Receivable Fin. Co., LLC*, 501 F.3d 398, 413 (5th Cir. 2007) (citing *Sec. & Exch. Comm'n v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). The D.C. Circuit has explained further that the burden is on a defendant to "clearly demonstrate that the disgorgement figure [established by the SEC] is not a reasonable approximation." *First*

11

*City Fin. Corp.*, 890 F.2d at 1231-32; *see also Sec. & Exch. Comm'n v. Silverman*, 328 F. App'x 601, 604-605 (11th Cir. 2009) (upholding $8.1 million disgorgement order based on finding that defendants failed to rebut the Commission's evidence because defendants "provide[d] no documentary evidence supporting their conclusory and self-serving affidavits"). Because Rawitt offers no evidence to support his contention that he was paid only $252,200, the Court relies upon the figure established by the SEC—in this case, $275,000.

Next, the Court looks to whether this amount should be reduced. Rawitt contends that it should, and points to the fact that, of the amount he was paid (which the Court assumes was $275,000), he paid $99,000 to salespeople, and $30,000 towards business expenses. He asserts that he retained less than $145,000. Rawitt further indicates that, as of June 30, 2011, he had a net worth of between $6300 and $7800. Ultimately, Rawitt's proposed bases for lowering his disgorgement obligation—money spent on business expenses and inability to pay—are the same as those asserted by James and Shindler. The outcome is likewise the same. The Court is unpersuaded that these factors should result in lowering Rawitt's disgorgement responsibility. The Court orders Rawitt to disgorge $275,000.

### B. Prejudgment Interest

The SEC seeks prejudgment interest from Defendants James and Shindler, and argues that prejudgment interest is appropriate because Defendants James and Shindler wrongfully obtained millions of dollars of investor money. According to the SEC, James and Shindler will have had the use and benefit of those funds from the time of their

violations until they satisfy their obligations to the SEC, and it would be inequitable to allow them to benefit from the use of the funds held during that period.

The Court cannot agree. As James and Shindler are both insolvent, prejudgment interest is not necessary to keep them from benefitting from their illegal activity. Clearly, any benefit to them has run its course by now. The SEC does not discuss the need to more fully compensate the victims in this case, nor does it refer to the remedial purpose of the statute. However, James' and Shindler's insolvency convinces the Court that they will be unable to pay any prejudgment interest, and thus that the injured parties will not benefit from the imposition of it. Moreover, the Court is convinced that, in this case, the purpose of the statute is served by the award of disgorgement against Defendants James and Shindler. In light of the fact that James and Shindler are insolvent and have been generally cooperative in the investigation, the Court finds that the equities weigh against awarding prejudgment interest in this case.

### C. Third-Tier Penalties

The SEC also seeks third-tier penalties from RET, REM, James, and Shindler. Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act provide for the imposition of a third-tier civil penalty if a defendant's violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C)(II); 15 U.S.C. § 78u(d)(3)(B)(iii).

The SEC argues that third-tier civil penalties are appropriate in this case because RET, REM, Shindler, and James committed violations involving fraud and deceit,

resulting in substantial losses to others. The SEC indicates that, based on the allowable amounts set forth in the statutes and adjusted for inflation pursuant to 17 C.F.R. § 201.1002, the maximum civil penalties for which RET, REM, Shindler and James may be held liable are $3,245,886; $1,852,249; $5,098,135, and $880,780, respectively. While the Court is sensitive to the gravity of James' and Shindler's actions, it is also sensitive to their current financial condition, and to what appear to be sincere affirmations that they understand the wrongfulness of their actions and have learned from the experience.

Looking to the five factors laid out in *AmeriFirst Funding*, 2008 WL 1959843, at *7, the Court finds that it lacks insufficient evidence of egregiousness and scienter to consider these first two prongs. In agreeing to the entry of judgment against them, Defendants James and Shindler waived findings of fact, conclusions of law, and any right to appeal the judgment. As such, the Court has not had the opportunity to consider the factual and legal bases for a conclusion that these Defendants' conduct was especially egregious, or that their degree of scienter was particularly high. The Court does understand, from the facts available, that James' and Shindler's conduct created substantial losses to other persons; thus, the third factor counsels in favor of imposing penalties. The fourth factor, whether the Defendants' conduct was isolated or recurrent, appears to counsel against penalties in this case. The Court has every reason to believe that this was an isolated chapter in James' and Shindler's lives. Finally, the fifth factor, whether the penalty should be reduced due to demonstrated current and future financial condition, counsels against an award of penalties. James' and Shindler's financial conditions are bleak, and the Court cannot see what purpose the imposition of penalties would serve as against these Defendants. In light of these factors and the Court's award

of full disgorgement, the Court declines to impose additional civil penalties, and expresses its sincerest hope that Defendants have learned from this experience.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that the SEC's Motion for Final Judgment of Disgorgement, Prejudgment Interest, and Third-Tier Civil Penalties must be **GRANTED IN PART** and **DENIED IN PART**. The Court orders disgorgement as follows:

- RET and Shindler are ordered to disgorge $3,245,886;
- REM and Shindler are ordered to disgorge $1,852,249;
- James is ordered to disgorge $880,780; and
- Rawitt is ordered to disgorge $275,000.

The Special Master has informed the Court that further funds may be recovered to offset Defendants' liability. The Court requests a status report from the Special Master should such further recoveries take place. The disgorgement awards against Defendants will be reduced appropriately by any further amounts recovered by the Special Master.

**IT IS SO ORDERED**.

**SIGNED** this the 1st day of February, 2012.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE